**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-22278-CIV-ALTONAGA/Goodman**

**ST. MARTINUS UNIVERSITY, NV**,

      Plaintiff,

v.

**CARIBBEAN HEALTH HOLDING,
LLC**; *et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendants, Caribbean Health Holding, LLC ("CHH"); Derek Van Walleghem; and John Vincent Scalia's Motion to Dismiss Second Amended Complaint [ECF No. 46] for lack of personal jurisdiction over Scalia under Federal Rule of Civil Procedure 12(b)(2); for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6); and on the basis of international comity, *res judicata*, collateral estoppel, and *forum non conveniens*. Plaintiff, St. Martinus University, NV ("SMU") filed a Response in Opposition [ECF No. 55]; to which Defendants filed a Reply [ECF No. 57]. The Court has carefully considered the Second Amended Complaint ("SAC") [ECF No. 40], the parties' written submissions, and applicable law.

## I.     BACKGROUND

This lawsuit concerns a dispute over membership interest in SMU, a Curaçao public company; allegations Defendants misdirected funds due to SMU from U.S. federal student loan programs; and allegations Defendants fabricated Promissory Notes memorializing loans they made to SMU. (*See generally* SAC). Defendant, Derek Van Walleghem resides in Florida. (*See id.* ¶

4). Defendant, John Vincent Scalia owns property in Florida but is a resident of New York. (*See id.* ¶¶ 5–6). Walleghem is a managing member and Scalia is a member of CHH, a limited liability company with a registered office in Florida. (*See id.* ¶¶ 3–4, 7). Walleghem and Scalia are former SMU Board members. (*See id.* ¶ 14).

On October 17, 2019, Plaintiff filed the operative complaint seeking declaratory relief as to CHH's ownership interest in SMU and alleging: conversion (Count II) against Scalia and Walleghem; and unjust enrichment (Count III), fraud (Count IV), conspiracy to commit fraud (Count V), violation of the Florida Criminal Practices Act, section 772.104, Florida Statutes (Count VI), and embezzlement (Count VII) against all Defendants. (*See generally* SAC). The facts relevant to Plaintiff's claims follow.

### A.    Creation of SMU and its Financial Liabilities

SMU was founded in October 2000 as a private higher education institution to provide education and training in the medical and healthcare fields. (*See id.* ¶ 11). Scalia and Walleghem were on the Supervisory Board of SMU and managed its affairs. (*See id.* ¶ 14). In 2001, SMU obtained a loan from Banco di Caribe in Curaçao. (*See id.* ¶ 21). The terms of the loan prohibited issuance of any other obligation or loan without the express written consent of the lender. (*See id.*).

In December 2007, Walleghem, Scalia, and SMU's other Board members entered into a shareholders' agreement ("2007 Shareholders' Agreement").[1] (*See id.* ¶ 15; *see also id.*, Ex. A, 2007 Shareholders' Agreement [ECF No. 40-1]). The purpose of the 2007 Shareholders' Agreement was to memorialize the then-existing shareholders' intent to sell and transfer 100

---

[1] Plaintiff states the Board members "*purportedly* entered into a Shareholders' Agreement." (SAC ¶ 15 (emphasis added)). Plaintiff does not appear to contest the validity of the 2007 Shareholders' Agreement but states it was not disclosed to SMU until 2019. (*See id.* ¶ 18).

percent of their shares of SMU to the Manipal Education Group for $4.5 million and to settle SMU's liabilities. (*See* SAC ¶ 19; 2007 Shareholders' Agreement 2). The 2007 Shareholders' Agreement states all liabilities incurred after January 1, 2008 will be "borne by the Shareholders mutually." (2007 Shareholders' Agreement § 1.10). The 2007 Shareholders' Agreement contains forum-selection and choice-of-law provisions in favor of the Netherlands Antilles. (*See id.* §§ 3.1– 3.2). The sale to Manipal Education Group contemplated by the 2007 Shareholders' Agreement was never completed. (*See* SAC ¶ 19).

Between December 13, 2007 and February 14, 2008, Scalia and Walleghem purportedly made personal loans to SMU totaling approximately $180,000.00. (*See id.* ¶ 22). The loans were memorialized in Promissory Notes (*see* [ECF No. 40-2]); however, the Promissory Notes created prior to the 2007 Shareholders' Agreement were not disclosed in the Agreement (*see* SAC ¶ 23). Even though the 2007 Shareholders' Agreement states the shareholders, not SMU, would bear subsequent liabilities, the Promissory Notes created after the 2007 Shareholders' Agreement were made to the account of SMU. (*See id.* ¶ 24).

According to Plaintiff, "at some time after July 22, 2015, the Promissory Notes . . . were assigned by Scalia and Walleghem to CHH." (*Id.* ¶ 31 (alteration added; block letters omitted)). In its Response, Plaintiff argues the assignment was fraudulent because Scalia assigned his interest in the Promissory Notes for no consideration. (*See* Resp. 15). According to Defendants, Scalia assigned his claims against SMU for the amounts due under the Promissory Notes to CHH on June 12, 2014 in consideration for his membership interest in CHH. (*See* Reply 7; *see also* Sec. Suppl. Decl. of Scalia [ECF No. 57-1] ¶ 5 ("Pursuant to a valid Deed of Assignment dated June 12, 2014 prepared by Curaçao counsel, I assigned to CHH my claims against SMU for the amount due under these promissory notes . . . . These assignments were additional capital contributions . . . to CHH."

(alterations added))). Defendants supply the Deed of Assignment. (*See* Composite Ex. [ECF No. 57-1] 10–16).

### B. Defendants' Alleged Student Loan Scheme

SMU students qualify for U.S. federal loan programs such as Nelnet and Sallie Mae. (*See* SAC ¶ 46). SMU uses the proceeds from federal loans to pay for tuition, clinical programs, and living expenses. (*See id.* ¶ 47). At some point during their management of SMU, Scalia, Walleghem, and other Board members registered two limited liability companies — one in New York ("SMU LLC New York"), and one in Delaware with a registered office in Fairfax, Virginia ("SMU LLC Virginia") — to facilitate deposits to SMU from federal loan servicers. (*See id.* ¶ 48). Neither SMU LLC New York nor SMU LLC Virginia was owned by, registered, or related to SMU; but Scalia controlled the bank account associated with SMU LLC New York. (*See id.* ¶¶ 48–49).

On December 12, 2007, at the direction of Scalia, SMU Board member Roger Courtney transferred $177,000.00 of federal student loans from SMU LLC Virginia to SMU LLC New York's bank account. (*See id.* ¶ 50; *see also id.*, Ex. I, Affidavit # 1 ("Courtney Aff.") [ECF No. 40-9]). Courtney believed the funds were for tuition and living expenses and that Scalia had been given authority to manage the money to "preserve the funds from mismanagement" of another Board member, Jayant Kurmar Pritamdas Daryanani. (Courtney Aff. 4–5). By September 10, 2015, Courtney learned the funds were never forwarded to SMU. (*See* SAC ¶ 51). The exact date Courtney learned the funds were not transferred is unclear.[2] Plaintiff contends, "upon information and belief," Scalia later transferred the funds from SMU LLC NY to CHH. (*Id.* ¶¶ 7, 53).

---

[2] Courtney does not indicate the exact date he learned the funds were not transferred to SMU or whether he was aware, before September 10, 2015, the funds were not transferred. (*See* Courtney Aff. 5).

### C. Maple Leaf Share Purchase Agreement, Formation of Defendant CHH, and Defendants' Demand for Repayment

According to Plaintiff, in March 2008, after the failed transaction with Manipal Education Group, Scalia, Walleghem, and several other Board members sold their interests in SMU to Maple Leaf Education Fund, Ltd. ("Maple Leaf"). (*See id.* ¶ 59; *see also id.*, Ex. J, Share Purchase Agreement [ECF No. 40-10]).[3] As part of the Share Purchase Agreement, Maple Leaf settled and satisfied SMU's existing obligations, including two liabilities claimed by Scalia and Walleghem for $230,000.00 and $80,000.00, respectively. (*See id.* ¶ 60).

In September 2009, Scalia and Walleghem registered Defendant CHH.[4] (*See id.* ¶ 27). Plaintiff contends approximately one year later, in October 2010, Scalia and Walleghem transferred the same interest in SMU previously sold to Maple Leaf to CHH. (*See id.* ¶ 61). As a result, CHH acquired 644,055 shares (33.97%) in SMU. (*See id.* ¶ 28). CHH continues to assert an ownership interest in SMU, but according to Plaintiff, Scalia and Walleghem have not disclosed how and for what value CHH obtained its ownership interest. (*See id.* ¶¶ 29–30). According to Defendants, Scalia transferred his interest in SMU to CHH under a Contribution Agreement as a capital contribution in consideration for his membership interest in CHH. (*See* Sec. Suppl. Decl. of Scalia ¶ 3 ("As I testified, I personally owned shares in SMU . . . . As reflected in the Contribution Agreement . . . I contributed my shares in SMU to [CHH] as my capital contribution,

---

[3] The Share Purchase Agreement lists Scalia and Walleghem among the "Vendors" selling shares in SMU to Maple Leaf; however, neither Scalia nor Walleghem signed the Share Purchase Agreement. (*See* Share Purchase Agreement 5, 12, 16).

[4] Plaintiff alleges Scalia and Walleghem are "owners and managers" (SAC ¶ 27) of CHH but also states Walleghem is the "*sole* member manager of CHH" (*id.* ¶ 4 (emphasis added)). According to Defendants, Scalia is merely a member, not a manager, of CHH. (*See* Mot. 13 (citing Decl. of Scalia [ECF No. 46-1] ¶ 12).

in consideration for my membership interest in CHH." (alterations added)).[5] After CHH acquired its interest in SMU, it sold five percent of its interest to International Healthcare Holding, LLC ("IHH"). (*See* SAC ¶ 32).

In October 2013, Scalia and Walleghem made a general demand for repayment of the amounts due under the Promissory Notes, referencing a shareholders' agreement dated October 21, 2010 ("2010 Shareholders' Agreement"). (*See id.* ¶ 33; *see also id.*, Ex. C, 2010 Shareholders' Agreement [ECF No. 40-3]). The 2010 Shareholders' Agreement contemplated an entity "NEWCO" would purchase shares of SMU from CHH; as of the date of transfer, SMU owed Scalia $156,282.00 and Walleghem $54,359.00. (*See* 2010 Shareholders' Agreement 2–3). The 2010 Shareholders' Agreement contains a choice-of-law provision in favor of "Curaçao, member of the Kingdom of the Netherlands" and a venue-selection clause stating "[a]ny differences arising out of this Agreement or any other future agreements resulting here from [sic] shall be exclusively submitted to the Court of [F]irst [I]nstance of Curaçao. " (2010 Shareholders' Agreement §§ 6.3, 6.5 (alterations added)).

Prior to the demand for repayment, the loans set forth in the 2010 Shareholders' Agreement "were not identified to IHH as the subject Promissory Notes" and no documentation to support such claims was provided or attached to the 2010 Shareholders' Agreement. (SAC ¶ 33).

Plaintiff demanded, but did not receive, documentation substantiating the loans allegedly due to Scalia and Walleghem. (*See id.* ¶ 34). As a result, Plaintiff "could not recognize any loans . . . [or] the Promissory Notes to be later claimed by CHH." (*Id.* ¶ 35 (alterations added)).

---

[5] Defendants supply the Contribution Agreement. (*See* Ex. 1 [ECF No. 57-1] 6–8).

### D. The Curaçao Lawsuits

**The 2013 Lawsuit.** After IHH acquired an interest in SMU, CHH's interest was put into question. (*See id.* ¶ 66). In 2013, CHH filed a summary proceeding against Plaintiff and IHH in the Court of First Instance of Curaçao, in Case No. KG 60324/2013 (the "2013 Lawsuit"). (*See id.* ¶ 69). The parties eventually entered into a settlement agreement whereby Plaintiff and IHH "unconditionally and unreservedly recognize[d] CHH as the holder of 537,055 shares in SMU." (2013 Settlement Agreement [ECF No. 40-11] ¶ 1 (alteration added); *see also* SAC ¶ 71).[6] Plaintiff contends it was disadvantaged by the Curaçaoan court's procedural rules and "forced to accept" the 2013 Settlement Agreement. (SAC ¶ 71). Plaintiff further states the summary proceedings in Curaçao were not "final, substantive or binding" and "could lead to another substantive proceeding." (*Id.* ¶¶ 71, 76).

According to Defendants, the Settlement Agreement is binding and remains so because Plaintiff has taken no action to dissolve or nullify it. (*See generally* Sec. Suppl. Decl. of Pieter Michiel Noordhoek [ECF No. 46-7]). Notably, the Settlement Agreement states "[t]he agreement cannot be annulled or dissolved." (Settlement Agreement ¶ 7 (alteration added); *see also* Sec. Suppl. Decl. of Pieter Michiel Noordhoek ¶ 14).

**The 2015 Promissory Notes Lawsuit.** In 2015, CHH filed a second lawsuit in the Curaçao Court of First Instance, in Case No. AR 74758/2015 (the "2015 Promissory Notes Lawsuit"), seeking repayment of the loans due to Scalia and Walleghem set forth in the 2010 Settlement Agreement, memorialized in the Promissory Notes, and purportedly assigned to CHH. (*See* SAC ¶¶ 36, 77). Plaintiff asserts CHH initiated the lawsuit "[i]n retaliation of SMU and IHH's demand

---

[6] The 2013 Settlement Agreement consists of the original document in Dutch and a version translated to English. (*See generally id.*). Unless otherwise noted, citations to documents from the Curaçaoan Lawsuits refer to certified translations.

for proof of the unsubstantiated loans that CHH sought to collect on or about October 2013." (*Id.* ¶ 77 (alteration added)).[7] During the 2015 Promissory Notes Lawsuit, CHH produced records of the Promissory Notes and photocopies of checks written to SMU.[8] (*See id.* ¶ 37). The court in Curaçao initially rejected several of CHH's claims but at a subsequent hearing allowed CHH to present evidence of the loan amounts it asserted. (*See id.* ¶ 38; *see also id.*, Ex. F Aug. 21, 2017 J. [ECF No. 40-6]). Following the hearing, on February 18, 2019, the court entered judgment *against* SMU "for the amount requested by Defendants." (*Id.* ¶ 39; *see also id.*, Ex. H, Feb. 18, 2019 J. [ECF No. 40-8]). On February 26, 2019, CHH levied attachment in execution of the February 18, 2019 Judgment. (*See* Mot. 8).

Plaintiff contends, as with the 2013 Lawsuit, it was disadvantaged by the Curaçao court's procedural rules. (*See* SAC ¶¶ 40, 78). Plaintiff was not allowed to seek discovery regarding the legitimacy of the Promissory Notes, consideration for the Notes, or the bank accounts into which the loans were allegedly deposited. (*See id.* ¶ 40). On March 18, 2019, SMU appealed the August 21, 2017 Judgment allowing CHH to present evidence of the Promissory Notes and the February 18, 2019 Judgment in CHH's favor. (*See* Mot. 8). This appeal, Case No. CUR 2019 H 00085 ("Promissory Notes Appeal"), is pending in the Joint Court of Justice of Aruba, Curaçao, Sint Maarten and of Bonaire, Sint Eustatius and Saba. (*See id.*).[9]

---

[7] The Court assumes Plaintiff refers to the loan repayments that Scalia and Walleghem — not CHH — demanded in 2013 because CHH was not created until 2015.

[8] According to Plaintiff, the checks were written to SMU but deposited in a bank account controlled by Scalia. (*See* SAC ¶ 37).

[9] SMU appears to have introduced evidence of Defendants' alleged student loan scheme, dating back to 2007, in the 2015 Promissory Notes Lawsuit. (*See* Feb. 18, 2019 J. 8 (noting a "written statement of Courtney" mentioning "transfers from SMU LLC in Virginia to SMU LLC in New York")). Whether and to what extent the Curaçao court considered this evidence — as opposed to the primary dispute regarding the legitimacy of the Promissory Notes — is unclear. SMU repeats allegations regarding the alleged student loan scheme in the Promissory Notes Appeal. (*See* Suppl. Decl. of Pieter Michiel Noordhoek [ECF No. 46-4], Ex. 1, SMU Statement of Appeal [ECF No. 46-4] 35–64). Specifically, SMU contends Scalia

Plaintiff also challenged CHH's execution of the February 18, 2019 Curaçao Judgment, but the Curaçao Court of First Instance dismissed this claim on April 24, 2019 ("April 24, 2019 Judgment"). (*See* Decl. of Pieter Michiel Noordhoek [ECF No. 46-3] ¶¶ 15–16; *see also id.*, Ex. 5, Apr. 24, 2019 J. [ECF No. 46-3] 55–63).

**The 2015 SMU Lawsuit.** In 2015, Plaintiff filed a lawsuit against CHH and various other defendants in the Court of First Instance of Curaçao in Case No. AR 72274/2015 (the "2015 SMU Lawsuit"). (*See* SAC ¶ 82). Plaintiff's claims concerned proprietary records wrongfully withheld from Plaintiff and the alleged mismanagement of certain student loans issued by SMU directly to SMU students. (*See id.* ¶¶ 83, 87). According to Plaintiff, the 2015 SMU Lawsuit did not concern the mismanagement of loans from U.S. federal loan servicers such as Nelnet and Sallie Mae. (*See id.* ¶ 87).

CHH asserted several defenses and filed a counterclaim against SMU. (*See id.* ¶ 88). Plaintiff did not file a timely response and although it moved for a continuance, the Curaçao court entered judgment against Plaintiff on August 21, 2017. (*See id.* ¶ 89; *see also* Aug. 21, 2017 SMU Lawsuit J. [ECF No. 40-12]). Plaintiff states the Curaçao court also entered partial judgment against SMU and overruled the temporary 2013 Settlement Agreement. (*See* SAC ¶ 90 (August 21, 2017 SMU Lawsuit J. 28)).[10] According to Defendants, however, "the 2013 [] Settlement

---

directed the transfer of $177,000.00 of student loan funds from SMU LLC Virginia's bank account to SMU LLC New York's bank account. (*See id.* 39–40).

[10] Plaintiff cites to the August 21, 2017 SMU Lawsuit Judgment to support its contention the Curacao court "overruled the temporary judgment from the 2013 Case" (SAC ¶ 90), but the Court cannot identify language in that Judgment substantiating this contention. Tellingly, as noted by Defendants (*see* Resp. 5), the declaration of Plaintiff's own Curaçaoan lawyer merely states the August 21, 2017 SMU Judgment recognized the 2013 Settlement Agreement as "preliminary" and "held that it remained possible for IHH to challenge the shareholdership proceeding . . . ." (Decl. of Paul Van Laarschot Decl. [ECF No. 40-7] ¶ 16 (alteration added; emphasis omitted)).

Agreement has not been overturned or overruled in Curaçao, and remains binding . . . ." (Mot. 6 (alterations added)).

SMU appealed the August 21, 2017 SMU Lawsuit Judgment. This appeal, Case No. CUR 2018 H00170 ("SMU Lawsuit Appeal"), like the Promissory Notes Appeal, is pending in the Joint Court of Justice of Aruba, Curaçao, Sint Maarten and of Bonaire, Sint Eustatius and Saba. (*See* Mot. 10).

\*     \*     \*

In sum, Plaintiff and the corporate Defendant have previously litigated several lawsuits in Curaçao, with Walleghem appearing as a witness on behalf of CHH. (*See* SAC Ex. H Feb. 18, 2019 J). The 2013 Lawsuit and 2013 Settlement Agreement concerned CHH's Membership interest in SMU. The 2015 Promissory Notes Lawsuit concerned the validity and enforceability of the Promissory Notes. The parties differ as to the numerous claims at issue in the 2015 SMU Lawsuit but agree at a minimum it concerned Plaintiff's attempt to obtain documents from CHH. In addition, Plaintiff has filed the SMU Lawsuit Appeal and Promissory Notes Appeal. In connection with the latter, Plaintiff has introduced allegations concerning Defendants' alleged student loan scheme.

This lawsuit followed.

## II.    LEGAL STANDARDS

While Defendants move to dismiss the SAC on several grounds, the Court only addresses the requested dismissals for lack of personal jurisdiction over Scalia, international comity, and *forum non conveniens*. The relevant standards for these are described.

**A.      Dismissal for Lack of Personal Jurisdiction**

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim against it by asserting the defense of lack of personal jurisdiction.  Because "[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons," *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (alteration added; citing Fed. R. Civ. P. 4(k)(1)(A)), a federal court sitting in Florida may properly exercise personal jurisdiction only if the requirements of (1) Florida's long-arm statute and (2) the Due Process Clause of the Fourteenth Amendment to the United States Constitution are both satisfied.  *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999) (citing *Sculptchair, Inc. v. Century Arts Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996)).

"There are two types of personal jurisdiction: specific and general."  *Madara v. Hall*, 916 F.2d 1510, 1516 n.7 (11th Cir. 1990).  "General personal jurisdiction is based on a defendant's substantial activity in [a state] without regard to where the cause of action arose[,]" whereas "specific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within [a state.]"  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013) (alterations added; citations omitted).

"A plaintiff seeking to obtain jurisdiction over a non-resident defendant initially need only allege sufficient facts to make out a prima face case of jurisdiction."  *Posner*, 178 F.3d at 1214 (citing *Electro Eng'g Prods. Co. v. Lewis*, 352 So. 2d 862, 864 (Fla. 1977)).  "The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits."  *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1286 (S.D. Fla. 2014) (citing *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000)).  If a plaintiff pleads sufficient facts to support the exercise of personal jurisdiction, the burden shifts to the

defendant to make a *prima facie* showing of the inapplicability of the state's long-arm statute.  *See Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam) (quoting *Prentice v. Prentice Colour, Inc.*, 779 F. Supp. 578, 583 (M.D. Fla. 1991)).

If the defendant satisfies its burden, the plaintiff must then "substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Id.* (quoting *Prentice*, 779 F. Supp. at 583).  "The district court must construe all reasonable inferences in the light most favorable to the plaintiff when dealing with conflicting evidence." *Peruyero*, 83 F. Supp. 3d at 1287 (citing *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010)) (other citation omitted).

## B.  Dismissal for International Comity

International comity is an abstention doctrine.  *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004).  The comity doctrine "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Examination of international comity is one factor in a larger, canopying analysis of international abstention.  *See Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518–19 (11th Cir. 1994).

The Eleventh Circuit's oft-cited decision in *Turner Entertainment* provides a thorough review of considerations relevant to the international abstention analysis.  *See Tr. Int'l Corp. v. Nagy*, No. 15-80253-Civ, 2017 WL 5248425, at *4 (S.D. Fla. Mar. 28, 2017) (noting the framework for analysis of international abstention — including international comity — set forth in *Turner Entertainment*).  In *Turner Entertainment*, the court identified three "goals in the area of concurrent international jurisdiction: (1) a proper level of respect for the acts of our fellow

sovereign nations — a rather vague concept referred to in American jurisprudence as international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial resources." *Turner Entm't Co.*, 25 F.3d at 1518 (footnote call number omitted); *see also Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1305 (11th Cir. 2008) (recognizing three goals set forth in *Turner Entertainment*).

Each "goal" encompasses three to four factors. Analysis of the first goal — promotion of comity — considers "[a] whether the judgment was rendered via fraud, . . . [b] whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence, . . . and [c] whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't Co.*, 25 F.3d at 1519 (alterations added; citations omitted). The second goal — fairness — considers "[a] the order in which the suits were filed, . . . [b] the more convenient forum, . . . and [c] the possibility of prejudice to parties resulting from abstention." *Id.* at 1521–22 (alterations added; citations omitted). And the third goal — efficiency — considers "[a] the inconvenience of the federal forum, . . . [b] the desirability of avoiding piecemeal litigation, . . . [c] whether the actions have parties and issues in common, . . . and [d] whether the alternative forum is likely to render a prompt disposition[.]" *Id.* at 1522 (alterations added; citations omitted).[11] If application of the foregoing factors favors deference to a foreign judgment or foreign

---

[11] Courts considering abstention or dismissal on international comity grounds vary in the depth of their analyses. Some cases limit analysis to the first goal, likely because the first goal *is* the comity analysis itself. *See, e.g.*, *Ungaro-Benages*, 379 F.3d at 1238 (noting the analysis of retrospective international comity considers (a) whether the foreign legal forum was competent, (b) whether the judgment was rendered by fraud, and (c) whether the foreign judgment was prejudicial); *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (setting forth the same three factors). Other courts have considered each of the three *Turner Entertainment* goals and their respective subfactors. *See, e.g.*, *Tr. Int'l Corp.*, 2017 WL 5248425 at *4–5 (reviewing *Turner Entertainment* and setting forth the three goals — comity, fairness and efficiency — and their corresponding subfactors — (1) fraud, competence, and

13

legal proceedings, the court must then consider whether to stay or dismiss the action before it.  *See id.* at 1523.

Since *Turner Entertainment*, the Eleventh Circuit has expanded the analysis of international comity (goal one), noting "[t]he doctrine of international comity can be applied retrospectively or prospectively."  *Ungaro-Benages*, 379 F.3d at 1238 (alteration added).  When "applied retrospectively . . . courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings."  *CDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030 (11th Cir. 2014) (citation omitted).  Courts analyze the same three comity factors — fraud, competence, and prejudice — as well as "whether the central issue in dispute is a matter of foreign law and whether there is a prospect of conflicting judgments."  *Ungaro-Benages*, 379 F.3d at 1238 (citing *Turner Entm't*, 25 F.3d at 1519, 1521).  "When applied prospectively, domestic courts consider whether to dismiss or stay a domestic action based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum."  *Id.* (citations omitted); *see also Mujica v. AirScan Inc.*, 771 F.3d 580, 621 (9th Cir. 2014) (Zilly, J., concurring in part) (noting in the Eleventh Circuit retrospective adjudicative comity "accord[s] respect to foreign judgments or defer[s] to parallel foreign proceedings," while prospective adjudicative comity "occur[s] when a domestic action is stayed or dismissed based on the respective interests of the domestic and foreign governments and the adequacy of the foreign forum in potentially resolving the dispute." (alterations added; citation omitted)).

---

prejudice; (2) order, convenience, and prejudice; and (3) convenience, the avoidance of piecemeal litigation; commonality, and promptness).

### C.      Dismissal for *Forum Non Conveniens*

"The doctrine of *forum non conveniens* permits a court with venue to decline to exercise its jurisdiction when the parties' and court's own convenience, as well as the relevant public and private interests, indicate that the action should be tried in a different forum." *Pierre–Louis v. Newvac Corp.*, 584 F.3d 1052, 1056 (11th Cir. 2009) (italicization added). In general, to obtain dismissal on the ground of *forum non conveniens*, Defendants must show:

> (i) that an adequate alternative forum is available, (ii) that relevant public and private interests weigh in favor of dismissal, and (iii) that the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice. Pertinent private interests of the litigants include relative ease of access to evidence in the competing fora, availability of witnesses and compulsory process over them, the cost of obtaining evidence, and the enforceability of a judgment. Relevant public interests include the familiarity of the court(s) with the governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally.

*Id.* (quoting *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1356–57 (11th Cir. 2008)). The private and public interests should be considered in all cases. *See Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001). Moreover, in evaluating the private and public interests implicated by the venue of the litigation "the district judge must consider the level of deference to accord the plaintiff's choice of forum." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3828 (3d ed. 2007).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (quotation marks and citation omitted). Because a valid forum-selection clause "protects [the parties'] legitimate expectations and furthers vital interests of the justice system[,]" it should be "given controlling

weight in all but the most exceptional cases." *Id.* (alterations added; quotation marks and citations omitted).

The presence of a valid forum-selection clause requires the district court to adjust its *forum non conveniens* analysis in three ways. *See id.* at 63. First, "the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Second, the district court should only consider the public-interest factors, as the parties "waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a [section] 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules — a factor that in some circumstances may affect public-interest considerations." *Id.* (alteration added; citation omitted).

## III. ANALYSIS

### A. Claims and Arguments

As noted, Plaintiff alleges seven claims — one for a declaratory judgment and six state-tort-law claims. Underlying these claims are three distinct sets of factual allegations: (1) those concerning CHH's membership interest in SMU and whether Defendants Scalia and Walleghem validly transferred their interests in SMU to CHH ("SMU Membership Interest Allegations"); (2) those concerning the creation and validity of the Promissory Notes ("Promissory Notes Allegations); and (3) those concerning Defendants' alleged student loan scheme dating back to 2007 ("Student Loan Scheme Allegations").

Defendants argue the Court lacks jurisdiction over Scalia, a New York resident with few Florida contacts. (*See id.* 11–17). Defendants also argue the Court should abstain from exercising

its jurisdiction based on international comity because Curaçao has a greater interest in the action and the Curaçao Lawsuits involve the same nucleus of operative facts as the facts at issue in this action. (*See id.* 17–21). For reasons similar to the ones advanced in their international comity analysis, Defendants argue the Court should dismiss this case under the doctrine of *forum non conveniens*. (*See id.* 22–27).

By way of summary, the Court finds it has no general or specific personal jurisdiction over Scalia. Next, the Court agrees with Defendants the claims raising the SMU Membership Interest Allegations and Promissory Notes Allegations should be dismissed under the doctrine of retrospective international comity. The Court finds the same with respect to the Student Loan Scheme Allegations. Finally, a *forum non conveniens* analysis dictates Curaçao is the more convenient forum to address all of Plaintiff's claims.

### B.     Personal Jurisdiction

Defendants argue the Court has neither general nor specific personal jurisdiction over Scalia. The Court agrees.

#### 1.   General Personal Jurisdiction

General jurisdiction arises from a non-resident defendant's contacts with the forum that are unrelated to the cause of action being litigated. *See Consol. Dev. Corp.*, 216 F.3d at 1291. Under Florida's Long-Arm Statute, Florida Statute section 48.193(2), the Court may exercise general personal jurisdiction over any defendant "who is engaged in substantial and not isolated activity within this state, . . . whether or not the claim arises from that activity." Fla. Stat. § 48.193(2) (alteration added). Plaintiff alleges "[a]t all times material to this lawsuit, Scalia engaged in substantial and not isolated activity within the State of Florida, such that Scalia should reasonably anticipate being subject to the jurisdiction of this state." (SAC ¶ 6 (alteration added; block letters

omitted)).    In  support,  Plaintiff  primarily  points  to  the  fact  Scalia  owns  and  rents-out  a
condominium in Florida.  (*See* Resp. 13–14).

Defendants do not contest Scalia owns a partial interest in a Florida condominium, but they
state  the  nature  of  his  contacts  with  Florida  is  not  enough  to  give  rise  to  general  jurisdiction.
Defendants emphasize

> Scalia testified he has not personally received any rental income from the vacation
> condominium, and he has never operated a business related to the condominium in
> Florida.  Scalia owns a minority interest in the condo, does not manage the rentals
> of the condo, is not involved in the rentals and has not entered into any rental
> agreements.  Scalia does not own or have access to any bank accounts in Florida.

(Reply 4–5 (citing Examination Before Trial of John Scalia [ECF No. 56-1] 99:5–13, 43:21–25;
and Sec. Suppl. Decl. of Scalia ¶¶ 6–7 (internal citations omitted))).

Defendants have the better view.  "[T]he facts required to assert [] general jurisdiction must
be  extensive  and  pervasive."  *Am.  Overseas  Marine  Corp.  v.  Patterson*,  632  So.  2d  1124,  1128
(Fla. 1st DCA 1994) (alterations added; internal quotation marks and citations omitted).  "The
defendant's  contacts  with  the  forum  must  be  continuous  and  systematic  to  support  the  exercise  of
general  jurisdiction."  *Fraser  v.  Smith*,  594  F.3d  842,  846  (11th  Cir.  2010)  (internal  quotation
marks and citation omitted).  Mere ownership of rental property in Florida does not meet the
relatively high bar to establish general personal jurisdiction here.  *See Pals Grp., Inc. v. Lacaye
Beverage  Corp.*,  No.  09-21857-Civ,  2010  WL  11504805,  at  *8  (S.D.  Fla.  Mar.  10,  2010)
(declining to find general jurisdiction over individual defendant who owned and rented property
in Broward County, entered to rental agreements with Florida companies, received payments from
Florida rental companies, and deposited rent payments in a Florida bank).[12]

---

[12] The cases on which Plaintiff relies are readily distinguishable.  In *Dean v. Johns*, 789 So. 2d 1072 (Fla.
1st DCA 2001), the court found general personal jurisdiction over a doctor domiciled in Alabama who
obtained and maintained a medical license in Florida, continued to fulfill Florida's continuing educational
and  financial  requirements,  regularly  consulted  with  Florida  physicians  by  phone,  and  owned  rental

In any event, Scalia's contacts do not rise to the "continuous and systematic" level required by the Due Process Clause. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ." *Daimler AG*, 571 U.S. at 137 (alteration added; internal quotation marks and citation omitted). "Beyond that, the Supreme Court has provided two other instances in which the exercise of general jurisdiction over an individual is proper: where the individual consents to the forum's jurisdiction, and where the individual is present within the forum when served with process." *McCullough v. Royal Caribbean Cruises, Ltd.*, 268 F. Supp. 3d 1336, 1350 (S.D. Fla. 2017) (citations omitted). Neither instance has occurred here; therefore, general personal jurisdiction is lacking.

### 2. Specific Personal Jurisdiction

A defendant is subject to specific personal jurisdiction under Florida's long-arm statute if the plaintiff's claim "aris[es] from" a defendant's specific forum-related contacts. Fla. Stat. § 48.193(1)(a) (alteration added). "Although the term 'arising from' is somewhat broader than the concept of proximate cause, under Florida law there must nevertheless be some 'direct affiliation,' 'nexus,' or 'substantial connection' between the cause of action and the activities within the state." *Sun Trust Bank v. Sun Int'l Hotels Ltd.*, 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001) (internal quotation marks and citation omitted). As noted, if a plaintiff pleads sufficient facts to support the

---

property in Florida. (*See generally id.*). The doctor's ownership of rental property was but one of a multitude of factors supporting general jurisdiction. (*See id.* at 1078).

*Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357 (11th Cir. 2006), and *Garris v. Thomasville-Thomas County Humane Society, Inc.*, 941 So. 2d 540 (Fla. 4th DCA 2006), concerned corporate defendants whose contacts with Florida were significantly more pronounced than the individual Defendant here. Moreover, these cases pre-date *Daimler AG v. Bauman*, 571 U.S. 117 (2014), which held corporate defendants are only subject to jurisdiction in the forum of their incorporation and principal place of business.

exercise of personal jurisdiction, the burden shifts to the defendant to show the inapplicability of the state's long-arm statute. *See Future Tech. Today, Inc.*, 218 F.3d at 1249. "If the defendant sustains this burden, the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Id.* (citation omitted).

Plaintiff alleges the Court has personal jurisdiction over Scalia under section 48.193(1)(a)(2), Florida Statutes, because he committed a "tortious act" in Florida.[13] (*See* SAC ¶ 7). Plaintiff states "[u]pon information and belief Scalia [] improperly wire-transferred [U.S. federal student loan funds] to Defendant CHH in Florida rather than to Plaintiff SMU in Curaçao" and, accordingly, "Scalia was complicit in the scheme perpetrated between the Defendants to misappropriate the funds belonging to Plaintiff[] and hold them under Defendant CHH in Florida." (*Id.* (alterations added; block letters omitted)). This allegation is otherwise bereft of detail. Notably, it is unclear when or how — after the initial transfer of funds from SMU LLC Virginia to SMU LLC New York in 2007 — Plaintiff alleges the subsequent transfer to CHH occurred.

Assuming Plaintiff has set forth enough facts to support the exercise of personal jurisdiction based on an alleged tortious act, the burden shifts to Defendants to rebut Plaintiff's case. Defendants have done so. Defendants submit an affidavit declaring (1) Scalia "did not wire transfer funds of SMU to any account in Florida" and did not "wire transfer any funds from any bank account in the name of SMU LLC in New York or Virginia to [CHH] in Florida; (2) to

---

[13] Plaintiff arguably alleges the Court has specific jurisdiction over Scalia because of his membership in CHH (*see* SAC ¶ 7), but mere membership in a Florida company is not enough to obtain specific personal jurisdiction over a defendant. "The business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort." *Carmouche v. Carnival Corp.*, 36 F. Supp. 3d 1335, 1340 (S.D. Fla. 2014), *aff'd sub nom. Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201 (11th Cir. 2015) (citations omitted).

Scalia's knowledge "no such transfer to CHH in Florida ever occurred;" and (3) to Scalia's knowledge, "the SMU LLC bank accounts in New York were closed before CHH opened an account in Florida, and therefore, the alleged wire transfer to CHH in Florida could never have occurred." (Scalia Suppl. Decl. [ECF No. 46-2] ¶ 8 (alteration added)). Scalia's affidavit is sufficiently detailed to shift the burden back to Plaintiff, as it contains more than "conclusory assertions that the defendant is not subject to jurisdiction." *Tobinick v. Novella*, No. 9:14-cv-80781, 2014 WL 7407500, at *1 (S.D. Fla. Sept. 25, 2014) (internal quotation marks and citation omitted); *see also id.* at *1–2 (finding the defendant's factual allegation it did not engage in the tortious conduct alleged by the plaintiff sufficient to shift the burden to the plaintiff to prove personal jurisdiction existed).

Tellingly, Plaintiff does not address Scalia's affidavit. In fact, in responding to Defendants' arguments regarding specific personal jurisdiction, Plaintiff entirely changes tack. Instead of submitting affidavits or evidence concerning the Student Loan Scheme Allegations, Plaintiff argues Defendants' misconduct with respect to the Promissory Notes and/or CHH's membership interest in SMU gives rise to personal jurisdiction:

> Defendant may be found subject to the jurisdiction of Florida through specific jurisdiction. Section 48.193 (1)(a)(2), Fla. Stat., establishes specific jurisdiction in instances where the Defendant has committed a tortious act within the State. The Defendant purposefully availed himself to [sic] the jurisdiction of Florida when he fraudulently assignment [sic] his interest in the promissory notes between himself and SMU to CHH for no consideration. . . . Additionally, Defendant Scalia transferred his shares in SMU to CHH that [sic] constituted yet another fraudulent transfer of shares to the corporation for no consideration. Scalia and Walleghem ostensibly used the corporation as a vehicle to transfer assets to avoid personal liability. *See Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145 (Fla. 4th DCA 1994) (holding that the defendant fraudulently transferred his ownership of one business to another because there was no consideration for the exchange).

(Resp. 15 (alteration added)). None of these arguments concern Plaintiff's original position Scalia's alleged fraudulent transfer of student loan funds provides the basis for jurisdiction.

In any event, these new arguments are insufficient to establish personal jurisdiction. As detailed below, claims associated with the SMU Membership Interest Allegations and Promissory Notes Allegations should be dismissed given international comity and *forum non conveniens*. Defendants have also presented evidence Scalia transferred his shares in SMU to CHH in consideration for his membership interest in CHH. (*See* Sec. Suppl. Decl. of Scalia ¶ 3 ("As I testified, I personally owned shares in SMU . . . . As reflected in the Contribution Agreement . . . I contributed my shares in SMU to [CHH] as my capital contribution, in consideration for my membership interest in CHH." (alterations added)); *see also* Contribution Agreement). With respect to the Promissory Notes, Defendants have presented evidence CHH provided Scalia consideration in exchange for the same. (*See id.* ¶ 5 ("Pursuant to a valid Deed of Assignment dated June 12, 2014 prepared by Curaçao counsel, I assigned to CHH my claims against SMU for the amount due under these promissory notes . . . . These assignments were additional capital contribution [to CHH]" (alterations added)); *see also* Deed of Assignment).

Because Plaintiff fails to substantiate its jurisdictional allegations in the SAC with affidavits or other competent proof, personal jurisdiction over Scalia under Florida's long-arm statute is lacking. In so finding, the Court need not undergo a Due Process Analysis.

## C. International Abstention

### 1. SMU Membership Interest and Promissory Notes Allegations

The Court applies the retrospective international comity analysis to the claims that rely on the SMU Membership Interest Allegations and Promissory Notes Allegations because both sets of factual allegations are the subject of foreign judgments and/or parallel legal proceedings. *See CDG Acquisitions, LLC*, 749 F.3d at 1030.

Plaintiff's protestation its claims in the Curaçao Lawsuits are "unrelated" (Resp. 21) to its allegations here is unavailing. Plaintiff does not dispute the SMU Membership Interest Allegations were litigated in the 2013 Lawsuit. (*See id.* 4 (stating "CHH's ownership of its purported interest [in SMU] was put into question [and] . . . CHH filed [the 2013 Lawsuit] in Curaçao against SMU" (alterations added))). Indeed, in all parties' accounts, CHH's membership interest in SMU was the precise issue before the Curaçao court in the 2013 Lawsuit. (*See* Mot. 6–7; Resp. 4–6).[14]

Nor does Plaintiff dispute it ligated the Promissory Notes Allegations in the 2015 Promissory Notes Lawsuit. (*See* Resp. 7 (stating "CHH fil[ed] the 2015 [Promissory Notes Lawsuit] . . . presenting, for the first time, record of the purported Promissory Notes." (alterations added))). Plaintiff's statement it is "not directly challenging the judgment entered in Curaçao in the 2015 Promissory Notes Lawsuit" but that nevertheless "the legitimacy of the issuance of the Promissory Notes and their assignment . . . to CHH were not and could have not been litigated" (Resp. 8 (alterations added)), is internally inconsistent and fails to persuade. Plaintiff's insistence it is not attempting to undermine the 2015 Promissory Notes Lawsuit is belied by its allegation in the SAC that Defendants "were unjustly conferred a benefit through . . . proceeds resulting from an *improper judgment obtained in the* [*2015 Promissory Notes Lawsuit*] . . . . " (SAC ¶ 103 (alterations and emphasis added)).

---

[14] Plaintiff discusses the 2013 Lawsuit at length and contends it was "forced to accept [a] temporary settlement agreement" (Resp. 5 (alteration added)) recognizing CHH's interest in SMU. Plaintiff later contends the Curaçao court "overruled the temporary judgment from the 2013 case" (*id.* 6), but if true, this fact would not render Plaintiff's current allegations regarding membership interest in SMU "unrelated" to the Curaçao Lawsuits — quite the opposite. Moreover, if the Curaçao court overruled the 2013 Settlement in favor of Plaintiff — a fact Defendants dispute — it is unclear why Plaintiff finds it necessary to seek further remedies here. Finally, the Court finds unavailing Plaintiff's argument "the fraudulent transfer of interest in SMU to CHH . . . [has] not been challenged or brought in any prior proceeding in Curaçao." (Resp. 20–21 (alterations added)). Plaintiff's failure to present particularized *evidence* in support of its defense in the 2013 Lawsuit does not alter the fact the issue of membership interest in SMU was litigated and settled in Curaçao.

While Plaintiff contends it was disadvantaged by the Curaçao court's discovery and evidentiary rules, it concedes the Curaçao court entered judgment in February 2019 against SMU "for the amount requested by Defendants" under the Promissory Notes. (*Id.* ¶ 39). Plaintiff is challenging this ruling in the Promissory Notes Appeal. (*See* Mot. 7–8). In sum, the Curaçao court has already ruled on allegations concerning CHH's membership interest in SMU and the validity or enforceability of the Promissory Notes, and therefore retrospective international comity applies.

Having determined a retrospective international comity analysis is appropriate, the Court turns to the three international abstention goals identified in *Turner Entertainment*. Plaintiff and Defendants correctly review the three *Turner Entertainment* goals and their respective factors. Defendants argue the goals of comity, fairness, and efficiency favor dismissal. (*See* Mot. 17–20). Not surprisingly, Plaintiff argues the opposite. (*See* Resp. 18–22).

**Comity**. As noted, the comity analysis considers the foreign court's competence, whether the judgment was rendered by fraud, and whether the foreign judgment was prejudicial, "in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't*, 25 F.3d at 1519 (citations omitted). A fourth factor — whether the central issue in dispute is a matter of foreign law and whether continuation of the domestic case risks conflicting judgments — is also considered. *See Ungaro-Benages*, 379 F.3d at 1238.

The first three factors — competence, fraud, and prejudice — weigh in favor of abstention. Plaintiff does not directly argue the Curaçao courts lacked competency. Instead, Plaintiff contends the "discovery proceedings and the conduct of the courts in Curaçao precluded the Plaintiff from seeking appropriate discovery to properly defend the claims asserted by CHH . . . ." (Resp. 21–22

(alteration added)). Yet, Plaintiff cites no authority supporting the proposition differences in a foreign court's discovery rules render that court incompetent. In contrast, Defendants point to *Banco Latino v. Gomez Lopez*, noting the court there found Venezuela an adequate forum despite the plaintiff's argument "lack of discovery and other pretrial procedures, as well as procedural failings [would] prevent plaintiffs from obtaining adequate relief." 17 F. Supp. 2d 1327, 1331 (S.D. Fla. 1998) (alteration added; internal quotation marks omitted).[15]

Additionally, the Court's review of the voluminous Curaçao proceedings leaves no doubt Plaintiff was afforded notice and the opportunity to participate. In this respect, the Court is guided by *Daewoo Motor America, Inc.*, 459 F.3d 1249. There, the Eleventh Circuit found the district court "did not abuse its discretion when it granted comity to the order of the Korean Court," *id.* at 1259, notwithstanding the plaintiff's contention "its claims against the defendants were not heard," *id.* at 1258. The *Daewoo* court emphasized the plaintiff "had notice of and participated in the [foreign] proceedings" and "the record evidenc[ed] [the plaintiff] received notice of all the main events[.]" *Id.* (alterations added).

There is no reason to question the competence of the Curaçaoan judicial system merely because its evidentiary, discovery, or procedural rules differ from those in the United States. Certainly, neither should Plaintiff, because the Curaçaoan Plaintiff itself initiated the 2015 SMU Lawsuit in its home country. For the same reasons, the so-called "restrictive" discovery does not render the decisions in the Curaçao Lawsuits prejudicial, "in the sense of violating American public policy." *Turner Entm't*, 25 F.3d at 1519.

As to fraud, "the international abstention consideration of fraud does not ask whether *parties* have acted deceptively or fraudulently." *Tr. Int'l Corp.*, 2017 WL 5248425, at *6

---

[15] It is irrelevant the *Banco Latino* court made this finding when analyzing *forum non conveniens. See* 17 F. Supp. 2d 1331–32.

(emphasis added). Instead, it asks "whether a foreign court was acting fraudulently and is a forum so incompetent in its standards that its procedures cannot be squared with the principles underlying the American legal system." *Id.* Plaintiff makes the conclusory statement the "limitations on the procedural and discovery laws of Curaçao . . . resulted in a violation of due process" (Resp. 10 (alteration added)) but points to no specific evidence the Curaçaoan courts engaged in fraud.

As to the fourth factor, the risk of conflicting judgments obviously weighs in favor of abstention. "While courts regularly permit parallel proceedings in an American court and a foreign court, once a judgment on the merits is reached in one of the cases . . . failure to defer to the judgment would have serious implications for the concerns of international comity." *Turner Entm't*, 25 F.3d at 1521 (alteration added; internal citation omitted). The merits of CHH's interest in SMU were resolved in the 2013 Settlement Agreement. (*See* 2013 Settlement Agreement ¶ 1 (stating "SMU and IHH hereby undertake to unconditionally and unreservedly recognize CHH as holder of 537,055 shares in SMU")). Whether the 2013 Settlement Agreement was "temporary" (Resp. 5) or "overruled" (*id.* 6) in subsequent proceedings, as Plaintiff contends, does not affect the Court's analysis.

The dispute over CHH's membership interest is far from its nascent stages. Any ruling here regarding membership interest in SMU, not to mention a declaratory judgment regarding the same, risks the undesirable prospect of "dueling courts." *Turner Entm't*, 25 F.3d at 1521 (internal quotation marks omitted). The Court finds the same with respect to the Promissory Notes dispute, which the Curaçao Court of the First Instance resolved in its February 18, 2019 Judgment, now pending appeal.

***Fairness***.  Analysis of fairness considers the order in which the suits were filed, the more convenient forum, and the possibility of prejudice to parties resulting from abstention.  *See Turner Entm't*, 25 F.3d at 1522.  All factors weigh in favor of abstention.

Each of the Curaçao Lawsuits was filed well before the present one.  The SMU Membership Interest Allegations and Promissory Notes Allegations have already been put before the Curaçao courts.  Plaintiff, the only party seeking to litigate in Florida, is a Curaçaoan company, so it will not be inconvenienced by continued litigation in its home forum.  What is more, the 2010 Shareholders' Agreement, which evidences SMU's assets and liabilities as of 2010, contains a choice-of-law provision in favor of "Curaçao, member of the Kingdom of the Netherlands" and a venue-selection clause stating "[a]ny differences arising out of this Agreement or any other future agreements resulting here from [sic] shall be exclusively submitted to the Court of [F]irst [I]nstance of Curaçao. "(2010 Shareholders' Agreement §§ 6.3, 6.5 (alterations added)).

The Court finds it would be largely *inconvenient* to prosecute a new case here, at the behest of a Curaçaoan Plaintiff seeking to litigate claims and issues involving Curaçaoan law, previously presented to and resolved by the Curaçaoan courts, and some awaiting resolution on appeal.  Although Plaintiff objects to the Curaçaoan courts' discovery and evidentiary rules, these perceived deficiencies do not suggest Plaintiff was deprived an opportunity to fairly litigate its claims and must now be afforded a second opportunity to do so.

***Efficiency***.  The efficiency analysis considers the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, whether the actions have parties and issues in common, and whether the alternative forum is likely to render a prompt disposition. *See Turner Entm't*, 25 F.3d at 1519.  As discussed, Curaçao has been and remains the more convenient forum to address the SMU Membership Interest Allegations and Promissory Notes Allegations.  The

Promissory Notes Appeal is pending, so addressing SMU's claim in this forum will give rise to piecemeal litigation.

As to commonality, the corporate parties in this case and the Curaçao Lawsuits — SMU and CHH — overlap and the Court has addressed, at length, the similarities between the allegations before the Curaçao courts and those here.[16] Far from "unrelated," "a more apt description" of Plaintiff's claims, "would be that Plaintiff . . . has not received all relief which it would like in [Curaçao] and would now seek to use this Court as a Court of further appeal to revisit claims, some of which are virtually identical, some of which are slight variations upon issues, which have been repeatedly addressed in another forum." *Tr. Int'l Corp.*, 2017 WL 5248425, at *6 (alterations added). It goes without saying the final factor, promptness, favors abstention, as the Curaçao Lawsuits are already concluded or in their advanced stages.

---

[16] While the individual Defendants, Scalia and Walleghem, are not parties to the 2013 Lawsuit or 2015 Promissory Notes Lawsuit, this does not change the outcome of the Court's comity analysis with respect to the SMU Membership Interest Allegations or the Promissory Notes Allegations. International abstention is also appropriate where a domestic case and a foreign action "are not identical, . . . [but] involve significantly common issues and parties." *Posner*, 178 F.3d at 1224 (alterations added). "[I]t is not necessary . . . that identical claims be brought in a case. What is necessary is that the Court, by deciding the case before it, would be entering an arena of *dueling courts*." *Tr. Int'l Corp.*, 2017 WL 5248425, at *5 (alterations and emphasis added); *see also Daewoo*, 459 F.3d at 1259 (noting an action "is a collateral attack if it must in some fashion overrule a previous judgment" even where "an action has an independent purpose and contemplates some other relief" (quoting *Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir.1972))). The Court cannot rule on the SMU Membership Interest Allegations without encroaching on the 2013 Settlement Agreement. Neither can the Court rule on allegations Scalia or Walleghem fabricated the Promissory Notes without encroaching on ongoing litigation in the Promissory Notes Appeal concerning the validity and enforceability of the very name Notes.

Although not technically a party to the 2015 Promissory Notes Lawsuit, Walleghem appeared in the case and offered evidence on behalf of CHH. (*See* Declaration of Derek Van Walleghem [ECF No. 46-8] ¶ 12 ("In 2015, CHH filed another action against SMU in the Court of First Instance of Curaçao seeking to enforce the promissory notes due to CHH by SMU. I testified in Curaçao in this proceeding in December 2017.")). The Curaçao Court of First Instance separately considered the "claim of Scalia" and the "claim of Van Walleghem" allegedly due to CHH. (*See* Aug. 21, 2017 J. 10–11).

***Conclusion on International Abstention***.[17]  In sum, *all* the international abstention goals identified in *Turner Entertainment* favor abstention from the exercise of jurisdiction.  In so finding, the Court must decide whether to dismiss or stay the claims relying on the SMU Membership Interest and Promissory Notes Allegations.  *See Turner Entm't*, 25 F.3d at 1523.  In *Turner Entertainment*, the court found a "stay rather than a dismissal of the American action" was appropriate where the foreign court "ha[d] yet to rule on appeal."  *Id.* at 1523 (alteration added). Here, however, and as discussed below, the Court finds Plaintiff's claims should be dismissed in favor of Curaçao under the doctrine of *forum non conveniens*.  Dismissal is the appropriate outcome.

## 2.    Student Loan Scheme

Plaintiff's third set of factual allegations underlying the SAC concerns the Student Loan Scheme.  Unlike the SMU Membership Interest and Promissory Notes Allegations, it is unclear the extent to which the claims raising the Student Loan Scheme Allegations are the subject of foreign judgments and/or parallel legal proceedings.  *See CDG Acquisitions, LLC*, 749 F.3d at 1030.  Plaintiff states these allegations have not (and could not have been) litigated in Curaçao: "the embezzlement of the U.S. Federal student loan funds through U.S. shell corporations and bank accounts and the fabrication of the promissory notes to cover up the scheme was not discovered until the culmination of the last 2015 Curaçao case . . . . Therefore, there was no possible way for the Plaintiff to assert claims for which it did not know."  (Resp. 20 (alteration added)).

---

[17] Before reaching its conclusion, the Court notes the one case Plaintiff relies on with respect to its comity argument — *Kleiman v. Wright*, No. 18-cv-80176, 2018 WL 6812914 (S.D. Fla. Dec. 27, 2018) — is inapposite.  In *Kleiman*, the court found international abstention principles did not apply where (1) the plaintiffs were Floridians; (2) their case was "distinct from the [foreign] proceedings;" (3) the foreign proceeding was "ministerial in nature;" and (4) it was "not readily apparent that the [foreign court] adjudicated the claims on the merits."  *Id.* at *12 (alterations added).  Those factors are missing here.

This argument is at odds with its Statement of Appeal in the Promissory Notes Appeal, where Plaintiff alleges:

> It was announced on 10 December 2007 that US$ 177,000.00 was [sic] in an account of SMU L.C.C. Virginia and that this money would be used to pay SMU creditors in Curaçao. Instead, at the request of Scalia, Courtney transferred this amount on 10 December 2007 to the account of SMU L.L.C. New York, which account is owned by Scalia.

(Statement of Appeal 39–40). These statements are the basis of Plaintiff's claims here regarding the student loan funds, save for Plaintiff's additional allegation the funds were subsequently transferred from SMU LLC New York to CHH. (*See* SAC ¶ 50 ("On or about December 12, 2007, Courtney, at the direction of Scalia, issued a wire transfer of $177,000.00 of US Federal Student Loans from SMU LLC Virginia to SMU LLC New York's bank account under the control of Scalia, of Student Loans paid to SMU by Nelnet." (block letters omitted))).

It is also evident Plaintiff views the Student Loan Scheme Allegations as connected to the Promissory Notes Allegations. As noted, Plaintiff argues Defendants "embezzle[ed] . . . U.S. Federal student loan funds through U.S. shell corporation and bank accounts *and fabricat*[*ed*] . . . *the promissory notes to cover up the scheme*." (Resp. 20 (alterations and emphasis added)). It is at least clear, therefore, that the Student Loan Scheme Allegations are entangled with the Promissory Notes dispute and have been introduced in an ongoing Curaçaoan proceeding. Because the Promissory Notes Appeal is an ongoing, parallel proceeding, a retrospective, rather than prospective, comity analysis more appropriate.

It is unnecessary to revisit the *Turner Entertainment* international abstention analysis in detail. The weight afforded the comity factors, discussed at length above, is the same: the Court has no reason to find the Curaçaoan judicial system is incompetent, has engaged in fraud, or that its ongoing jurisdiction over the Promissory Notes Appeal would be "prejudicial, in the sense of

violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't*, 25 F.3d at 1519 (citations omitted).

With respect to fairness, the order of filings weighs in favor of abstention, as Plaintiff's Statement of Appeal was filed on March 28, 2019, months before Plaintiff filed this case. (*See* Statement of Appeal 35). As to convenience, while it might be easier for Plaintiff to obtain evidence supporting its Student Loan Scheme Allegations in Florida or New York, ease of access to evidence does not tip the entire balance against abstention.

Finally, the Court has no concern Plaintiff will be prejudiced by abstention. To the extent the merits of the Student Loan Allegations are not disposed of in the Promissory Notes Appeal, there is no reason Plaintiff cannot bring any remaining claims regarding this issue in Curaçao. Indeed, as discussed below, Curaçao is the more convenient forum to address these claims. And because Plaintiff has alleged a connection between the Promissory Notes Allegations and the Student Loan Allegations, it would seem to promote efficiency (the third *Turner Entertainment* goal) to delineate this issue first in the Promissory Notes Appeal, and subsequently address the remaining claims, if any, in Curaçao.

### D. *Forum Non Conveniens*

Plaintiff does not dispute Curaçao is an adequate and available forum to address its allegations. As noted by Defendants, Plaintiff only argues that the second prong of the *forum non conveniens* analysis, the balancing of public and private interests, weighs against dismissal. (*See* Reply 12; Resp. 16). Plaintiff's argument is unpersuasive.

As stated, the 2010 Shareholders' Agreement contains a choice-of-law provision in favor of "Curaçao, member of the Kingdom of the Netherlands" and a venue-selection clause stating "[a]ny differences arising out of this Agreement or any other future agreements resulting here from

31

[sic] shall be exclusively submitted to the Court of [F]irst [I]nstance of Curaçao." (2010 Shareholders' Agreement §§ 6.3, 6.5 (alterations added)). Plaintiff "does not refute that SMU's 2010 Shareholders' Agreement applies to the relationship between the parties." (Reply 9). Instead, Plaintiff contends the "venue and governing law selections do not apply when the causes of action asserted fall outside of the contract or result from tortious acts not within the contractual relationship." (Resp. 10).

The Court agrees with Defendants that "[w]here a clause refers to claims or actions 'arising under or in connection with' the contract, the clause is taken to include 'all causes of action arising *directly or indirectly* from the business relationship evidenced by the contract.'" *McCoy v. Sandals Resorts Int'l, Ltd.*, No. 19-CV-22462, 2019 WL 6130444, at *11 (S.D. Fla. Nov. 19, 2019) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987); alteration added; emphasis in *McCoy*; other citation omitted). The 2010 Shareholders' Agreement concerns Defendants' shares in SMU and shareholder loans issued to SMU — issues central to SMU's claims in this case. The venue-selection clause applies to any "differences *arising out of*" the 2010 Shareholders' Agreement. (2010 Shareholders' Agreement § 6.5 (emphasis added)). Therefore, Plaintiff's claims with respect to the SMU Membership Interest Allegations and the Promissory Notes Allegations fall within the scope of the venue-selection clause.

Even if the Student Loan Scheme Allegations fall outside the scope of the 2010 Shareholders' Agreement, the *forum non conveniens* analysis still points toward Curaçao.[18] Preliminarily, the Court finds Plaintiff's choice of forum is entitled to less deference because

---

[18] The Court notes in *Atlantic Marine Construction Company*, the Supreme Court instructed district courts to "*not* consider arguments about the parties' private interests." *Id.* at 64 (emphasis added). Because the Court does not resolve whether the 2010 Shareholders' Agreement's venue-selection clause applies to all of the claims here, and because in any event the *forum non conveniens* analysis points to Curaçao, the Court finds engaging in a complete *forum non conveniens* analysis is the better approach.

Plaintiff is foreign. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981) ("Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." (footnote call number omitted)); *Paolicelli v. Ford Motor Co.*, 289 F. App'x 387, 390 (11th Cir. 2008) (citing *Piper*, 454 U.S. at 256).

> Turing to the balancing test,

> [p]ertinent private interests of the litigants include relative ease of access to evidence in the competing fora, availability of witnesses and compulsory process over them, the cost of obtaining evidence, and the enforceability of a judgment. Relevant public interests include the familiarity of the court(s) with the governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally.

*Pierre-Louis*, 584 F.3d at 1056 (alteration added; quoting *Renta*, 530 F.3d at 1356–57). As discussed, this case is essentially a Curaçaoan matter. Plaintiff is a Curaçaoan company. The SMU Membership Interest Allegations are the subject of the 2013 Settlement Agreement agreed-to in Curaçao, and the Promissory Notes Allegations are already the subject of a judgment and pending appeal in Curaçao. (*See* SAC ¶¶ 66–93; Mot. 4–11).

CHH is a party to the Curaçao Lawsuits, and Walleghem has appeared as a witness in the 2015 Promissory Notes Lawsuit. There is little concern regarding the need to assert compulsory process over these two parties. As to Scalia, the Court has already found it lacks jurisdiction over him.

Relevant evidence, including evidence pertaining to the Promissory Notes, has already been presented before the Curaçao courts. (*See* SAC ¶ 77). The Promissory Notes Appeal and the SMU Lawsuit Appeal are pending in Curaçao. (*See id.* ¶ 92; Mot. 9–10).

As to the Student Loan Allegations, while it might be easier to obtain evidence in New York or Florida, this single factor does not tip the balance against litigation in Curaçao. Plaintiff has already introduced the Student Loan Allegations, at least in part, in the Promissory Notes

Appeal. Efficiency would dictate these allegations should be addressed where they were first presented. Moreover, Plaintiff has been unable to establish the Court has personal jurisdiction over Scalia. Thus, Plaintiff would be unable to litigate the Student Loan Allegations here without a necessary party.

The public interest factors point in the same direction. This case's lengthy procedural history shows the courts in Curaçao are much more familiar with Plaintiff's allegations than this Court. The Court assumes Curaçao has an interest in continuing its jurisdiction over disputes concerning a Curaçaoan Plaintiff, *already being litigated* through various lawsuits in Curaçao. In other words, save for Plaintiff's vague and unsubstantiated allegation Scalia fraudulently transferred student loan funds from a New York LLC to CHH at some point between 2007 and 2015, this matter is local to Curaçao.

## IV.    CONCLUSION

The doctrine of international comity "encompasses the principle of respect for the acts of sovereign nations." *Belize Telecom, Ltd.*, 528 F.3d at 1305 (citation omitted). The Court has reviewed Plaintiff's allegations and the records from the Curaçaoan Lawsuits at length. Having done so, the Court finds most of Plaintiff's allegations are virtually identical to those put before the Curaçao courts, and the remainder are either entangled with ongoing proceedings in Curaçao or additional proceedings that Plaintiff may bring there. This case is, at its core, a Curaçaoan dispute and should continue to be litigated there.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants, Caribbean Health Holding, LLC; Derek Van Walleghem; and John Vincent Scalia's Motion to Dismiss Second Amended Complaint **[ECF No. 46]** is **GRANTED** in part as follows.

1.      Defendants' Motion to dismiss all claims against John Vincent Scalia for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) is **GRANTED**.  The claims against Scalia are dismissed without prejudice.

2.      Defendants' Motion to dismiss Plaintiff's claims on the basis of international comity and *forum non conveniens* is **GRANTED**.  Plaintiff's claims are dismissed without prejudice.

3.      Should CHH or Walleghem not submit to the jurisdiction of the Curaçaoan courts, Plaintiff may return to this forum and proceed with its claims against them.

**DONE AND ORDERED** in Miami, Florida, this 27th day of February, 2020.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record